UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

UNITED STATES OF AMERICA,

     Plaintiff,

v.                                    CASE NO: 8:07-cr-342-T-23MAP

YOUSEF SAMIR MEGAHED,

     Defendant.

_____/

## ORDER

On August 29, 2007, the grand jury returned an indictment against Ahmed Abdellatif Sherif Mohammed and Youssef Samir Megahed.  Pursuant to 18 U.S.C. § 3145(a)(1), the United States seeks (Doc. 23) revocation of the magistrate judge's September 14, 2007, pre-trial order releasing Megahed, a lawful permanent resident alien in the United States, on a $200,000 bond and an array of other conditions, including a "Nebbia hearing."  United States v. Nebbia, 357 F.2d 303 (2d Cir. 1966). Megahed responds in opposition.  (Doc. 32)

## A PROCEDURAL CLARIFICATION

After the hearing at which the magistrate judge granted conditional release, the United States filed a perfunctory, one-and-a-half-page paper entitled "Motion to Appeal Order of Release."  (Doc. 23)  However, the district court's evaluation of the magistrate judge's conditional order of release is not an "appeal"; governed by Section 3145(c), an "appeal" is the circuit court's evaluation of a district court's order.  Section 3145(a), entitled "review of a release order," contemplates a "motion for revocation" or, in

different circumstances, a "motion for amendment of the conditions."  The title "motion to appeal" is a confusing misnomer not only because the district court's review is not an appeal but because leave of the district court is unnecessary to accomplish review, which is available to "the attorney for the government" as a matter of right under Section 3145(a).  To further confuse matters, Megahed filed in response to the "motion to appeal" a paper entitled "Motion to Dismiss Government's Appeal of Order of Release" (Doc. 32), which in nine pages argues in support of the magistrate judge's release order but states no basis for "dismissal."  As already stated, the United States' preceding papers were not an "appeal" and, in any event, a motion to dismiss is not a procedurally proper response to a motion.

With respect to a motion, Local Rule 3.01(b) requires within ten days a "response that includes a memorandum of legal authority."  Perhaps realizing that the "motion to appeal" was a procedurally muddled offering that failed to identify either a legal or factual error committed by the magistrate judge or any particular respect in which the conditions of release imposed by the magistrate judge are insufficient to protect the community and ensure the defendant's appearance for trial, the United States filed a paper entitled "Government's Response and Memorandum of Law in Opposition to Defendant Megahed's Motion to Dismiss Appeal" (Doc. 37), which for the first time explains in detail certain objections by the United States to the magistrate judge's release order but which again overlooks to specify any respect in which the conditions of release imposed by the magistrate judge are insufficient to protect the community and ensure the defendant's appearance for trial.

Further, although managing to file a "motion to appeal," the United States failed to ask the magistrate judge to stay her release order pending review by the district court. In due course, the United States apparently realized the oversight and moved the magistrate judge to stay her order.  (Doc. 27)  Aware that the United States suddenly had corrected the oversight, the defense hastily responded in an effort to preserve the opportunity for release.  (Doc. 29)  Because the magistrate judge who presided at the detention hearing (who is not the magistrate judge assigned to the case) was unavailable on short notice, the "duty" magistrate judge granted the stay.

On behalf of procedural coherence, the United States' "motion to appeal" is construed as a motion for revocation under Section 3145(a) and the "Government's Response . . ." (Doc. 37) is construed as a memorandum of law in support of the motion for revocation.  The defense's "motion to dismiss" (Doc. 32) is construed as the required memorandum of law in opposition to the motion for revocation.

An unmistakable insouciance has contributed thus far to the complication of this case (and the attendant expenditure of valuable resources).  Counsel are admonished to exercise due care and attention to procedure, thereby avoiding any necessity for the court to act decisively to refresh and revitalize their respective attentiveness.

## **FINDINGS OF FACT**

At one hearing before the magistrate judge and one hearing before the district judge, both the United States and Megahed offered evidence either by proffer or by submission of exhibits.  The proffers are largely uncontroverted, although the interpretation of the information proffered is energetically controverted.

Megahed is a twenty-one year old male, who was born in Giza, Egypt, and who travels on an Egyptian passport (Megahed appears to possess two Egyptian passports, each featuring a photograph of Megahed but each using a different name, which Megahed explains reasonably as an administrative event arising from different versions of his surname).  Megahed has no remarkable health problem, no mental health problem, no substance abuse problem, and no criminal history other than that associated with the present episode.

Megahed moved with his family to the United States about ten years ago and to Tampa, Florida, in July, 2003, and enjoys "lawful permanent resident alien" status (i.e., Megahed is amenable to deportation if convicted of a felony and is subject to an outstanding detainer issued by United States Immigration and Customs Enforcement, the investigative arm of the Department of Homeland Security).  Megahed earlier lived in New York and California.  Megahed applied for naturalization in 2006 (the application was denied because Megahed's frequent international travel, which took him from the United States on about sixteen hundred days in about six years, prevented his satisfying the continuous residence requirement; five of the international trips exceeded six months).  Megahed enrolled in the University of South Florida in August, 2003, to pursue a bachelor of science degree in mechanical engineering.  His father, his mother, an adult brother, a minor brother, and an adult sister live with Megahed in a northeast Tampa rental residence, one of several rental homes in which the family has lived since arriving in the United States.  Megahed has neither a wife nor a child.  Only since 2007 has Megahed begun employment, first (and only briefly) at an automobile dealership

and afterward at a mental health service as a ten dollar per hour "technician."  Megahed has a checking account with a balance of about $3,000.00 but his parents require from him no contribution to his parents' household expenses. Neither Megahed's father nor his mother works outside the home, but the family enjoys "substantial business ties and interests in Egypt."  A naturalization application by Megahed claims his father owns investment real estate in Egypt.

In the early morning of August 4, 2007 (or late the night before), Megahed and Mohamed left Tampa and drove toward South Carolina.  (Megahed claims an intent to stop at one or more beaches along the way and, the defendant proffers, he actually stopped at Jacksonville Beach, but the United States proffers that law enforcement located no bathing suit in the car after the pair's arrest.)  Investigation reveals that the two stopped in Ocala, Florida, at a Wal-Mart about 4:00 a.m. and inquired with salespersons about the availability and price of certain high-powered rifles, including at least a .270 caliber Savage rifle and a Model 710 Remington rifle (available in an assortment of calibers, including .270).  Later in the morning, around 7:00, Megahed and Mohamed stopped at a Wal-Mart in Jacksonville and purchased a cleaning kit for a .30 caliber weapon (although law enforcement is unaware of either defendant's possessing a .30 caliber weapon).  These activities are akin to Megahed's purchase in July, 2007, of a .22 caliber rifle with a scope; his active practice, along with some companions, with the weapon at a Tampa gun range; and his inquiry with sales personnel during the July purchase about the availability of a Baretta handgun. (Megahed placed the .22 caliber rifle and scope in a rented storage unit, along with

some welding equipment and other paraphernalia.  Megahed's father denies knowledge

of both the purchase of the rifle and scope and the rental of the remote storage.)

Also during these stops at Wal-Mart in Ocala and Jacksonville, Mohamed purchased an

electrical drill, a GPS (global positioning system) device, and an electrical inverter (to

convert DC current to AC current).

After 5:00 on the afternoon of August 4 and on a rural road near Goose Creek,

South Carolina, two Berkeley County, South Carolina, deputy sheriffs stopped a car in

which Mohamed was the driver and Megahed was the passenger.  Megahed's brother,

who resides in the Tampa home with Megahed, owns the car but lent the car to

Megahed for this trip.  A police search of the car revealed three pieces of PVC pipe,

each cut into a different size and each a foot or less in length.  Each length of PVC pipe

contained a substance confirmed by an FBI explosives analyst to include the explosive

compound potassium nitrate ($KNO_3$), which was inserted, along with a binding carrier

medium comprising "kitty litter" and "Karo syrup," into each pipe section.  Law

enforcement discovered another plastic container holding an additional quantity of a

mixture of $KNO_3$.  The United States proffers without objection that this $KNO_3$ qualifies

under 18 U.S.C. § 841(c) as a mixture the transportation of which is forbidden without a

permit or license.  Accompanying this $KNO_3$ was twenty feet of safety fuse, the electric

drill purchased earlier at Wal-Mart, a five-gallon cannister approximately three-quarters

full of gasoline, and a box of .22 caliber ammunition.

Immediately upon his arrest, Megahed denied knowledge of the $KNO_3$ and other

unusual items in the trunk and elsewhere in the automobile.  However, after law

enforcement separated Megahed and his companion, questioned each further, and placed the pair together in a patrol car, a recorder captured a conversation between the two during which Megahed's statements apparently confirmed his awareness both of the presence of the $KNO_3$ and of the explosive capacity of the $KNO_3$.  Megahed also asked his companion about the pair's responses to any question about the gas container or about their associates, and Megahed expressed concern about the possible explosion of the $KNO_3$.  The gas cannister's surface contained Megahed's fingerprint.  The United States proffers that Megahed and his co-defendant attempted during this conversation to "get their story straight."  (The conversation occurred in Arabic and awaits definitive translation.)

As Berkeley County law enforcement approached the car in which Megahed and his companion drove in excess of the posted speed limit, the officers saw Megahed disconnecting cords from a laptop computer and attempting to stow the computer in the back seat of the automobile.  A consensual review of the laptop by law enforcement reveals that recent sites visited with the computer included displays of Qassam rockets and "visits to files with information on Hamas fighters, videos of martyrs and discussions of martyrdom, instructional information about the M-16 rifle," "a twelve-minute videotape . . . showing how to turn a radio-controlled car into a [remote control] detonator device," and other "files about rifles, weaponry, [and] the conflict in the Middle East."  (Similarly, a site recently visited on the internet by a computer at Megahed's home featured an auction for the sale of .50 caliber ammunition, a powerful load not typical in recreational use.)

The deputy sheriffs arrested Megahed and Mohamed.  A federal grand jury in Tampa indicted Megahed and Mohamed, both of whom returned to Tampa in federal custody, for transporting explosive material in interstate commerce without a permit or license in violation of 18 U.S.C. §§ 842(a)(30(A) and 2.  The indictment charges Mohamed separately under 18 U.S.C. § 842(p)(2)(A).  Mohamed waived a detention hearing and remains in custody.  The magistrate judge granted Megahed a conditional release, which is the subject of the motion for revocation by the United States.[1]  A stay preserves the <u>status</u> <u>quo</u> pending review.  (Docs. 27, 29, and 30)

## <u>CONCLUSIONS OF LAW</u>

At the initial detention hearing, the magistrate judge evaluated both "risk of flight" and "dangerousness," and the United States and Megahed agreed that the risk of Megahed's flight and his dangerousness to the community govern the magistrate judge's threshold determination.  The magistrate judge's evaluation of the risk of flight somewhat eludes review because the magistrate judge appears to state no pointed and

---

[1] The United States proffered a video recording (U.S. Exhibit 1 at the October 5th hearing) portraying Megahed's brother in the visitation area at the Falkenburg Road detention facility, where Megahed was detained near Tampa.  Megahed's brother is pictured blinking his eyes, gesturing with his fingers, and "mugging" into the camera.  The United States claims that by this behavior the brother signaled in some furtive or conspiratorial manner to Megahed (although his brother apparently knew that Megahed was not present to see his brother's machinations).  The United States discovered at Megahed's home a toy that is capable of use as a remote detonation device if modified in a manner depicted in a video recorded by Mohamed (but Megahed's little brother is about the proper age to play with such a toy).  The United States presented a scrap of paper on which Megahed wrote some notes during detention (although the notes seem routine and consistent with Megahed's concerns during detention.)  I find none of these matters compelling or even deserving of weight in considering Megahed's detention (although the Falkenburg video is mightily peculiar and the remote control toy is a provocative coincidence).  The United States proffers, without a detectable response from Megahed, that Megahed, Mohamed, and Megahed's brother are frequent companions and that a witness reports overhearing "hateful, anti-American conversations" among the three.  Although relations among the three, as well as "hateful, anti-American" utterances, if proven, may inform some aspect of this case, the remoteness and ambiguity of this proffer markedly reduce the weight of the proffered evidence.  Similarly, I attribute little or no weight to the supportive letters received on behalf of Megahed.

distinctive determination of about the risk of Megahed's flight.  On the other hand, the

magistrate judge pointedly stated her conclusion that Megahed was a danger to the

community:

> I end by saying that with regard to the nature and seriousness of the danger, I did agree he posed a danger.  There is no question about that, given what was found in their car.  No question about that.

The magistrate judge followed with an evaluation of whether:

> . . . the government has shown by clear and convincing evidence that there are no conditions that I can impose that would reasonably ensure that he not endanger the community.

The magistrate judge described in detail the conditions, including a bond of $200,000,

that she found adequate to protect the community against danger from Megahed.

A district court reviews de novo a magistrate judge's pre-trial release order.  See

United States v. Hurtado, 779 F.2d 1467, 1481 (11th Cir. 1985).  Review by the district

court contemplates an "independent consideration of all facts properly before it," United

States v. Gaviria, 828 F.2d 667, 670 (11th Cir. 1987) (citing Hurtado, 779 F.2d at

1480-81).  If the district court concludes after a careful review of both the parties' papers

and the evidence presented at the detention hearing that the evidence supports the

magistrate judge's findings of fact and if the district court concludes that the magistrate

judge correctly applied the law, "[t]he court may then explicitly adopt the magistrate's

pre-trial [release] order."  United States v. King, 849 F.2d 485, 490 (11th Cir. 1988).

However, if necessary to the resolution of an essential issue of fact, the district court

may marshal further evidence by convening a hearing.  King, 849 F.2d at 491.

The United States challenges neither (1) the magistrate judge's conclusion, which the United States expressly accepted at the detention hearing (Doc. 36 at 5 and 50), that no statutory presumption in favor of detention extends to the offense charged against Megahed[2] nor (2) the magistrate judge's statement, iterating the applicable burdens of proof, that "the government has to show detention based on the flight-risk ground by a preponderance of the evidence and detention based on the danger ground by clear and convincing evidence."

With the benefit of a second detention hearing, I find Megahed both a risk of flight and an unreasonable danger to the community.  First, Megahed (and probably his family) manifests ties to the community that are both recent in origin (beginning only in 2003 and characterized by frequent and protracted absence) and of uncertain duration. Megahed and his family appear without either prospective careers or present property that ties them individually or collectively to this community.  Neither the father nor the mother has a career outside the home and no member of the family owns a home in the community.  Megahed appears untethered except for his enrollment at the University of South Florida (and Megahed proffers that his college degree awaits only the completion

---

[2] Although the United States assumed (Doc. 36 at 5-6, 50-51) for purposes of the September 14, 2007, detention hearing that the charged offense is not a "crime of violence" under 18 U.S.C. § 3142(f)(1), Section 3156(4)(B) defines "crime of violence" in the Bail Reform Act to include "any . . . offense that is a felony and that, by its nature, involves a substantial risk that physical force against the person or property of another may be used in the course of committing the offense."  Unlicensed transportation of an explosive in interstate commerce imminently threatens property damage and personal injury or death to both the perpetrators and others.  See United States v. Jay, 2004 WL 744410, *2 (M.D. Fla. Apr. 8, 2004) (Spaulding, M.J.) (finding that the manufacture or possession of an unregistered destructive device in violation of 26 U.S.C. § 5861(d) or (f) constitutes a crime of violence within Section 3142(f)(1) because "destructive devices such as pipe bombs often explode during the attempt to make them, injuring the maker and persons and property within the range of the explosion.").

of three credit hours).  Megahed is a frequent and wide-ranging traveler without an enduring place of residence.  Megahed and his family live in rented housing.  Megahed is young and has no local investment (personal or financial), no established local career, and no other compelling attachment to this locality.  Megahed's family is here, but the family manifests the same peripatetic tendency as Megahed.  Although present in the community at the moment, neither Megahed nor his family displays firm roots likely to attract them strongly to remain in the community regardless of unpleasantness or complication.  If he (or his family) has some enduring and proximate attachment to or affinity for the community, Megahed forbore a splendid opportunity at the detention hearing to offer confirming (and reassuring) evidence.

Assessment of the flight risk posed by a defendant often implies a calculation of the relative cost of remaining and submitting to trial or, in the alternative, fleeing the jurisdiction.  In the instant case, Megahed stands indicted for interstate transportation of an explosive without a permit.  The facts apparently weigh heavily against him because an initial review suggests rather strongly that he departed Florida and traveled to South Carolina in an automobile that belongs to his brother and contained an explosive (one assumes that his brother would not "set him up" by sending him unknowingly on a trip with explosives hidden from him in the trunk).  Although some plausible and innocent explanation is conceivable, the present array of information offers no tangible suggestion (although defense counsel hypothesizes freely) of an innocent explanation (at least an explanation that is "innocent" in regard to the charged crime).[3]

---

[3] Of course, Section 3142(j) carefully partitions any conclusion about the crime for the purpose of detention from Megahed's presumption of innocence, which remains inviolate.

The United States and Megahed proffer that, if convicted, Megahed's probable sentence falls in a range approximating two years, followed by probable deportation.  If he flees the country and returns to Egypt (or elsewhere), Megahed will stand the same as if deported after conviction, except that he escapes two years or so of imprisonment. In the present circumstance, the likely prospect of conviction of the charged crime and the grim prospect of incarceration followed abruptly by deportation gravitate strongly toward the conclusion that Megahed poses an unacceptable risk of flight.  A young man's (or anyone else's) assessment of the hardship implied by a two-year imprisonment is unknowable, but the prospect seems especially forbidding if followed with apparent inevitability by deportation.  See United States v. Abdullah, 488 F. Supp. 2d 433, 442 (D.N.J. 2007).

Second, I find that Megahed's release presents an unacceptable danger to the community.  The evidence fails to establish or even suggest any innocent or wholesome explanation for the events that led to Megahed's arrest.  Although many of the occurrences viewed in isolation are outwardly innocent or susceptible of an innocent explanation, the sequence of events, including the time and place and the attendant circumstances, impel even a disinterested and cautious observer to question sharply whether any wholesome and inconsequential explanation accounts for the episode in its entirety.  Guns, explosives, fuses, canisters of gasoline, ammunition, welding equipment, GPS devices, all-night interstate drives to an unstated and indeterminate destination, stops to check gun prices and availability, and computers with a recent history of visits to sites that feature the advocates and the means of violence are not

attributes that a disinterested but cautious observer associates with a safe and tranquil citizen of the community.  Rather, a person about whom these attributes are discovered is a person whose means, motive, and degree of determination are unknown and unpredictable and who is highly suspicious and threatening.  Megahed offers not a scintilla of a evidence to support any reasonable explanation for his behavior; he states no destination for his journey; he states no non-destructive, non-lethal use for his cargo; he presents only a series of speculations or hypotheses, which are charitably described as "Pollyanna" in tone and content.  Megahed unpersuasively persists in a tepid and blanket insistence on his innocent disposition and benign intent toward his community.  Except for a lenient tendency to think the very best of a young person beginning both adult life and an engineering career, I have no basis in evidence or logic to accept the unsupported, innocent view of Megahed's action.

Because Megahed presents both a risk of flight and a danger to the community, the question recurs whether the imposition of a set of conditions sufficiently mitigates the risk of flight and the danger to the community to permit his release.  I find that no such conditions exist.

Neither electronic monitoring nor the GPS system of surveillance defeats the resolute, resourceful, energetic, and non-compliant releasee.  See United States v. Benevolence Int'l Found, Inc., 222 F. Supp. 2d 1005, 1007, (E.D. Ill. 2002).  Even attentive and persistent monitoring by personnel of Pre-trial Services leaves the possibility of some hours' delay in both notifying law enforcement of a releasee's departure and beginning an effective search with the aid of a warrant and other

essential aids to investigation and pursuit.  Although the methods and means of

maximizing this interval of delay are not publicly rehearsed, the delay inherent in

modern monitoring is commonly known and understood.  It suffices to say that a

determined releasee with resources and assistance (i.e., money and friends, such as

Megahed enjoys) poses an unreasonable and immediate risk of flight, likely to succeed

through the hours necessary to enter the traffic lanes prerequisite to departing the state

and the nation (especially from a port city on a peninsula surrounded by the Gulf of

Mexico and the Atlantic Ocean and only hours from a border openly and notoriously

breached thousands of times per day).  Especially if a releasee has no compelling and

enduring ties to the locality, the releasee's presence is not guaranteed by the present

techniques of monitoring, which are dependent ultimately on the availability and speed

of a sequence of human reactions (and which techniques are designed to "incentivize"

the compliant releasee and cannot reliably disable the non-compliant releasee).  In sum,

I find that available conditions fail to ensure reasonably that Megahed will remain

available for trial.

Further, I find that Megahed's release unreasonably and unacceptably endangers

the community and that no conditions of release sufficiently suppress the danger.  In

sum, Megahed stands accused of transporting a simple but effective explosive

compound, readily manufactured from commonly available ingredients.[4]  The most

plausible and still unrebutted inference from the evidence is that someone, either

---

[4] The United States proffers without rebuttal that $KNO_3$ is an "explosive."  The United States has not elaborated the explosive mechanism claimed, but this order assumes the pertinent compound of $KNO_3$ is an "explosive," as proffered.

Megahed and Mohamed or someone acting in concert with them, intended to use the compound to achieve the compound's intended and essential purpose, an explosion.  If that conclusion reigns (and it does), only the incurably credulous would confidently assume the person who possesses the explosive compound harbors only the objectives found among ordinary and peaceful persons who possess no explosive compound. Stated directly and plainly, if Megahed wants to blow something up or cause a disturbance with a compound including $KNO_3$, I cannot determine that any or all the proposed conditions of release disable him from doing so and, given his behavior on and before August 4, 2007, I am unwilling at the prospective cost of property damage, injury, or death to assume that he will not do so.  Only detention reasonably suppresses his access to the components and the confederates that enabled the brewing of the $KNO_3$ compound in the first instance.

At this time of international acts of destruction actuated by political and other objectives, the unaccountable possession of explosive material, especially in conjunction with the possession of fuses, ammunition, gasoline, and the like, constitutes an act that any comprehending adult person knows will arouse immediate alarm, suspicion, and inquiry.  Undoubtedly aware in general (if not in particular as a result of his education and his travel) of the turbulent state of affairs in the United States and elsewhere, Megahed nonetheless chose to venture into the night and into another state in the company of another person and in possession of an array of items likely, if discovered, to trigger the disapproving involvement of law enforcement.  Dismissive of good sense and defiant of the consequences, Megahed did what he did, the whole of

which repels (and certainly awaits) innocent explanation.  I cannot dismiss the real

prospect of additional erratic, unreasonable, and dangerous behavior from Megahed,

and I am unwilling to subject the community to the prospect, at least until further inquiry

(and, if necessary, a jury) places a definitive interpretation on these troubling events.

With reference to the provisions of Section 3142(g), Megahed is charged with a

crime that involves an explosive, the evidence weighs heavily against him, he lacks

persistent and enduring ties to the community and poses an unreasonable risk of flight,

and his behavior evidences erratic and unreasonable behavior of a character and to a

degree that endangers the community to an unacceptable extent.

### A STATUTORY MATTER

Another issue appears because at the second detention hearing, which was held

before the district court, Megahed receded from the earlier stipulation that risk of flight

and danger to the community govern detention and asserted instead that only

preponderant proof of an unacceptable risk of flight pertains to Megahed's detention.

Megahed's assertion presents an interesting and infrequently examined statutory issue,

a discussion of which begins with the Bail Reform Act of 1984 as interpreted in Chief

Justice Rehnquist's opinion in United States v. Salerno, 481 U. S. 739 (1987), which

resolved a challenge to the facial constitutionality of the Bail Reform Act.

In Salerno, the grand jury indicted Anthony Salerno and Vincent Cafaro in twenty-

nine count for "various Racketeer Influenced and Corrupt Organizations Act (RICO)

violations, mail and wire fraud offenses, extortion, and various criminal gambling

violations."  The United States "showed that Salerno was the 'boss' of the Genovese

crime family of La Cosa Nostra, that Cafaro was a 'captain' in the Genovese family," and

that Salerno and Cafaro "had participated in wide-ranging conspiracies to aid their

illegitimate enterprises through violent means," including murder.  Salerno and Cafaro

claimed that the Constitution prohibits the pre-trial detention of an arrestee based on the

prospect of future crimes because pre-trial detention based on only prospective

offenses constitutes an impermissible punitive measure rather than a permissible

regulatory measure.  On the way to rejecting this and other facial challenges to the Bail

Reform Act, Chief Justice Rehnquist noted the constraints on pre-trial detention and

stated:

> Nor are the incidents of pretrial detention excessive in relation to the
> regulatory goal Congress sought to achieve.  The Bail Reform Act carefully
> limits the circumstances under which detention may be sought to the most
> serious crimes.  <u>See</u> 18 U.S.C. §3142(f) (detention hearings available if
> case involves crimes of violence, offenses for which the sentence is life
> imprisonment or death, serious drug offenses, or certain repeat offenders).

Although this observation was not essential to the Supreme Court's holding in

<u>Salerno</u>, other courts spotted the statement.  For example, <u>United States v. Ploof</u>, 851

F. 2d 7, 11 (1st Cir. 1988), following <u>United States v. Himler</u>, 797 F.2d 156, 157 (3d Cir.

1986), concludes that:

> [T]he structure of [the Bail Reform Act] and its legislative history make it
> clear that Congress did not intend to authorize preventive detention unless
> the judicial officer first finds that one of the §3142(f) conditions for holding
> a detention hearing exists.  To conclude otherwise would be to ignore the
> statement in the legislative history that the "circumstances for invoking a
> detention hearing in effect serve to limit the types of cases in which
> detention may be ordered prior to trial," <u>see</u> S. Rep. No. 225, 98th Cong.,
> 2d Sess. 20, <u>reprinted in</u> 1984 U. S. Code & Admin. News 3182, 3203.

See also United States v. Byrd, 969 F.2d 106, 109-10 (5th Cir.1992); United States v. Friedman, 837 F.2d 48, 49 (2d Cir. 1988); United States v. Twine, 344 F.3d 987, 987 (9th Cir. 2003); United States v. DeBair, 16 F. Supp. 2d 592, 594-95 (D. Md. 1998) ("[The Act] allows dangerousness to justify detention only for those individuals who fall within the carefully delineated categories set forth in § 3142(f)(1), rather than those who pose a risk of flight or risk of obstruction of justice under (f)(2).")

In short, Salerno, Ploof, DeBair, and similar cases seem attached to the premise that detention is not available because of the prospective detainee's dangerousness unless the detainee is charged with a felony listed in Section 3142(f)(1).  This interpretation stands athwart both the words of the statute and the sense of the statute and a systematic review of the statute disproves this premise.[5]

---

[5] In Salerno, Chief Justice Rehnquist observes that the Act "carefully limits the circumstances under which detention may be sought to the most serious of crimes."  A review of the Act and a survey of the field of detention cases suggests that the Chief Justice mildly misstates.  The Act decidedly and carefully limits the circumstances of detention, but the pertinent limitations are unreasonable danger and risk of flight.  Even if charged with an offense listed in Section 3142(f)(1), a defendant is absolutely entitled to release if the defendant poses no unreasonable danger or risk of flight.  Section 3142(f)(1), a purely procedural provision, guarantees only that release of a defendant charged with an offense listed in Section 3142(f)(1) cannot occur without a hearing if the United States seeks a hearing; Section 3142(f)(1) does not assure detention.  Similarly, in Ploof, Chief Judge Campbell relies on a brief segment from a committee report to superimpose on Section 3142(f)(1) a meaning not ascertainable from the words of the statute.  The Constitution includes no provision empowering an unelected and unaccountable congressional staff to alter, amend, or restrict the meaning and effect of a statute by unadopted, undebated, and unnecessary speculation, included in so-called "committee reports."  See, e.g., Thompson v. Thompson, 484 U.S.174, 191-192 (1988) (Scalia, J., concurring) ("Committee reports, floor speeches, and even colloquies between congressmen . . . are frail substitutes for bicameral vote upon the text of a law and its presentment to the President. . .  It is at best dangerous to assume that all the necessary participants in the law-enactment process are acting upon the same unexpressed assumptions."); Sable Communications of California, Inc. V. F.C.C., 492 U.S.115, 133 (1989) (Scalia, J., concurring) ("Neither due process nor the First Amendment requires legislation to be supported by committee reports, floor debates, or even consideration, but only by a vote."); Green v. Bock Laundry Machine Company, 490 U.S. 504, 528-30 (1989) (Scalia, J., concurring); Blanchard v. Bergeron, 489 U.S. 87, 97-100 (1989) (Scalia, J., concurring) ("It is neither compatible with our judicial responsibility of assuring reasoned, consistent, and effective application of the statutes of the United States, nor conducive to a genuine effectuation of congressional intent, to give legislative force to each snippet of analysis, and even every case citation, in committee reports that are increasingly unreliable evidence of what the voting Members of Congress actually had in mind.")

Section 3142(a) of The Bail Reform Act, 18 U.S.C. §§ 3141-3150, 3156 (the "Act"), specifies the options available to a judicial officer considering the question of detention.  An assay of the options and the subsequent statutory sections detailing the options confirms that the "default" decision prescribed by the Act is release, failing which the Act prescribes an escalating series of options, each of which requires some measure of proof, leading finally to detention.  Essential to understanding the Act is the observation that release is the "default" option prescribed by the Act and release requires proof of nothing and typically requires no special hearing.

Section 3142(b) directs a judicial officer to order pretrial release on personal recognizance or upon the execution of an unsecured appearance bond "unless the judicial officer determines that such release will not reasonably assure the appearance of the person as required or will endanger the safety of any other person or the community."  In other words, release is the default decision, absent the required proof.

Section 3142(c) provides that, if release on personal recognizance or on an unsecured appearance bond fails to reasonably assure the arrestee's appearance or permits unreasonable danger to any person or to the community, a judicial officer must order the arrestee's pretrial release subject to conditions specified in the statute, including "the least restrictive . . . condition, or combination of conditions, that such judicial officer determines will reasonably assure the appearance of the person as required and the safety of any other person and the community."  In addition, Section 3142(c) details at length the specific conditions available to the judicial officer for

imposition on a detainee.  Even in Section 3142(c) the preferred decision is release, although accompanied by conditions, if and only to the extent necessary.

Section 3142(d) deals with temporary detention, a matter not pertinent to the present question, but Section 3142(d) is followed by Section 3142(e), which is entitled "Detention" and Section 3142(f), which is entitled "Detention Hearing."  Although the title of a section never absolutely controls or limits the effect of the section, these two titles warrant mention because each title precisely and accurately reveals exactly what the section prescribes.

Section 3142(e) specifies the circumstances requiring detention.  In unrestricted and plain language, Section 3142(e) states:

> If, after a hearing pursuant to the provisions of subsection (f) of this section, the judicial officer finds that no condition or combination of conditions will reasonably assure the appearance of the person as required and the safety of any other person and the community, such judicial officer shall order the detention of the person before trial.

This section is the heart of the Act; this section prescribes the two circumstances that warrant detention.  The section provides for detention if no set of conditions assures both the defendant's further appearance and the safety of each person in the community.  The statutory command is simple, complete, and entirely sensible: after a hearing a judge shall detain the defendant if necessary to reasonably assure the defendant's presence or to protect the community.

Salerno, Ploof, DeBair, and other cases construe the words "after a hearing pursuant to Section 3142(f)" to mean that no hearing can occur unless the indictment charges a crime listed in Section 3142(f)(1) and unless the government moves for a

hearing.  However, this anomalous interpretation overlooks the words of Section

3142(f)(1), which requires only that the court hold a hearing in certain cases if the

government moves for a hearing.  Section 3142(f)(1) states:

> **Detention hearing.** – The judicial officer shall hold a hearing to determine
> whether any condition or combination of conditions set forth in subsection
> (c) of this section will reasonably assure the appearance of such person
> as required and the safety of any other person and the community –
>
> > (1)  upon motion of the attorney for the Government, in a
> > case that involves – [a listed offense]

It is anomalous indeed to construe a statute that requires a hearing in a few

circumstances to forbid <u>sub</u> <u>silentio</u> a hearing in any other circumstance.  It is equally

anomalous to construe a statute that empowers the government to compel a hearing in

a listed instance to simultaneously (but silently) forbid the government's requesting a

hearing in every other instance.  The court generally needs no authority or specific grant

in order to hold a hearing; no reason exists to believe that Congress conceived the

requirement of a hearing in one circumstance to simultaneously and silently forbid a

hearing in any other circumstance.  For example, if a defendant is charged with a crime

listed in Section 3142(f)(1) and the government fails to ask for a hearing, does the

<u>Salerno</u>, <u>Ploof</u>, and <u>DeBair</u> interpretation propose (1) that the court must release the

defendant despite his dangerousness or (2) that the court cannot hold a hearing in any

event, even if the government fails or refuses to ask for a hearing?  Similarly, does the

<u>Salerno</u>, <u>Ploof</u>, and <u>DeBair</u> interpretation mean that the government cannot seek to

detain anyone else in any other instance at all, e.g., a counterfeiter whose liberty may

debauch the currency or prompt dangerous conflict with a co-conspirator or even a

competitor?  I cannot concur in this interpretation, which tortures words forbidding

release without a hearing in certain cases if the government seeks a hearing into words

that forbid detention in any other case involving any other charge and every other

offender despite imminent danger to the public (or to some ascertainable individual).

The obvious intent and the sole practical effect of Section 3142(f)(1) is to prohibit

the court's releasing any defendant charged with a listed offense without a hearing and

without the United States enjoying the opportunity to argue for, and offer evidence in

support of, detention and to preserve the record of that hearing for appeal in the event

that the court grants release contrary to the United States' recommendation.  In short,

Section 3142(f)(1) guarantees the United States a day in court and the opportunity to

"make a record" for appellate review before the court releases a defendant charged with

a listed offense.

The balance of Section 3142(f), i.e., that part of the section that follows (f)(1) and

(f)(2) but is not separately numbered, also prescribes a number of procedural

guarantees that apply at a detention hearing.  For example, Section 3142(f) requires an

"immediate" hearing and limits any continuance of the hearing; provides for medical

care during pre-hearing detention; provides for counsel for the defendant; provides the

defendant a right to testify, to present witnesses, to cross-examine, and to proffer

evidence; provides that the rules of trial evidence are not strictly applicable; and

provides for re-opening the detention hearing upon the appearance of newly available

information.  Of course, consistent with the theme of the Act, Section 3142 provides that

any detention order must determine (1) by a preponderance of the evidence that no

conditions of release will reasonably assure the appearance of the arrestee (risk of flight) or (2) by clear and convincing evidence that no conditions of release reasonably will assure the safety of another person or the community (dangerousness).

The words "after a hearing pursuant to Section 3142(f)," fairly and reasonably construed, mean "after a hearing held in accord with the procedural requirements prescribed in Section 3142(f)," a procedural section. Sections 3142(f)(1) and (f)(2) are nothing more than additional procedural requirements available to ensure the United States a day in court before release in a case in which the indictment charges a more reliably dangerous crime.

In sum, Section 3142 governs release and detention, and release is the default preference of the Act. Section 3142(e), tellingly entitled "Detention," requires a due process hearing as detailed in Section 3142(f) and a finding of dangerousness or risk of flight in order to detain. In addition to containing due process procedural guarantees applicable to the hearing required by Section 3142(e), Section 3142(f) guarantees that the court cannot release defendants charged with certain crimes without a hearing if the government asks for a hearing – only this and nothing more, as precisely stated in the words of Sections 3142(f)(1). Section 3142(e) is substantive, and Section 3142(f) is procedural; the former governs the detention and the latter governs the hearing.

Finally, Section 3142(g) directs the judicial officer determining whether any conditions of release will reasonably assure the arrestee's appearance and the safety of others to consider four factors:

(1) the nature and circumstances of the offense charged, including whether the offense is a crime of violence, a Federal crime of terrorism, or

involves a minor victim or a controlled substance, firearm, explosive, or destructive device;

(2) the weight of the evidence against the person;

(3) the history and characteristics of the person, including--

> (A) the person's character, physical and mental condition, family ties, employment, financial resources, length of residence in the community, community ties, past conduct, history relating to drug or alcohol abuse, criminal history, and record concerning appearance at court proceedings; and
> (B) whether, at the time of the current offense or arrest, the person was on probation, on parole, or on other release pending trial, sentencing, appeal, or completion of sentence for an offense under Federal, State, or local law; and

(4) the nature and seriousness of the danger to any person or the community that would be posed by the person's release.

Because the interpretation tendered by Megahed arises from only an obiter dictum in Salerno and a piece of a legislative committee report and because the Eleventh Circuit has not addressed the issue, I would reject the Salerno, Ploof, and DeBair interpretation of the Act and find that the Act authorizes detention in any case in which the court determines after a due process hearing (1) by a preponderance of the evidence that no conditions of release will reasonably assure the appearance of the arrestee (risk of flight) or (2) by clear and convincing evidence that no conditions of release reasonably will assure the safety of another person or the community (dangerousness).  I would not find that the procedural guarantees of Section 3142(f) trump the substantive commands in the balance of the Act, especially Section 3142(e). However, the present case presents no necessity for that rejection because the United States both establishes by a preponderance of the evidence that Megahed presents an

unacceptable risk of flight and establishes by clear and convincing evidence that

Megahed poses an unreasonable danger to the community.

## CONCLUSION

The United States' construed motion for revocation (Doc. 23) is **GRANTED**, the

magistrate judge's conditional order of release is **REVOKED**, and Megahed is

**DETAINED**.

ORDERED in Tampa, Florida, on October 25, 2007.

_____

**STEVEN D. MERRYDAY**
**UNITED STATES DISTRICT JUDGE**